TAX COURT OF NEW JERSEY



Joshua D. Novin
Judge

Washington & Court Streets, 1st Floor
P.O. Box 910
Morristown, New Jersey 07963
Tel: (609) 815-2922, Ext. 54680
Fax: (973) 656-4305

NOT FOR PUBLICATION WITHOUT THE APPROVAL
OF THE TAX COURT COMMITTEE ON OPINIONS

September 4, 2018

David J. Yanotchko, Esq.
Florio Kenny Raval, LLP
5 Marine View Plaza, Suite 103
Hoboken, New Jersey 07030

Scott G. Collins, Esq.
Rudy Randazzo, Esq.
Riker Danzig Scherer Hyland Perretti, LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, New Jersey 07962-1981

Lamiaa E. Elfar, Esq.
Elfar & Associates, PC
15 Ramsey Road, Suite 2
Middletown, New Jersey 07748

> Re:  Railway Avenue Properties LLC, v. Paterson City
> Docket Nos. 014575-2015 and 007018-2016
>
> Paterson Charter School for Science and Technology v. Paterson City
> Docket Nos. 014599-2015 and 007075-2016

Dear Mr. Yanotchko, Mr. Collins, Mr. Randazzo, and Ms. Elfar:

This letter shall constitute the court's opinion on defendant, City of Paterson's

("Paterson"), motions for partial summary judgment, plaintiff, Paterson Charter School for Science

and Technology's ("PCSST"), cross-motions for summary judgment, and defendant, Railway Avenue Properties, LLC's ("Railway Avenue"), cross-motions for summary judgment.[1]

For reasons explained herein, the court concludes that the property, which is the subject matter of these tax appeals, is owned and used in a manner consistent with the criteria for local property tax exemption under N.J.S.A. 54:4-3.6.[2]  Accordingly, the court denies Paterson's motions for partial summary judgment, denies PCSST's cross-motions for summary judgment, and grants Railway Avenue's motions for summary judgment.

## I.    **Procedural History and Findings of Fact**

Pursuant to R. 1:7-4, the court makes the following findings of fact and conclusions of law based on the certifications and exhibits submitted by the parties.

Railway Avenue is a limited liability company, formed in 2011 under the New Jersey Limited Liability Company Act.[3]  Railway Avenue's sole member is Apple Educational Services Inc. ("Apple"), a nonprofit corporation organized under the laws of the State of New York, and authorized to transact business in New Jersey.  Apple's Restated Certificate of Incorporation recites that its organizational purpose is to "improve the quality of educational institutions by

---

[1]  Paterson's motions are captioned as "Motion[s] for Summary Judgment."  However, because PCSST's pleadings raise claims for exemption, valuation, and discrimination, Paterson's motions as to PCSST are more appropriately characterized as motions for partial summary judgment.

[2]  Because the court concludes that the subject property is exempt from local property tax during the tax years at issue under N.J.S.A. 54:4-3.6, the court does not need to address the validity of Paterson's 2015 added assessment.  See Borough of Red Bank v. RMC – Meridian Health, ___ N.J. Tax ___ (Tax 2018).

[3] The New Jersey Limited Liability Company Act, N.J.S.A. 42:2B-1 to -70, was repealed by L. 2012, c. 50.  The Revised Uniform Limited Liability Company Act, N.J.S.A. 42:2C-1 to -17, L. 2012, c. 50 (eff. March 18, 2013), now governs New Jersey limited liability companies, regardless of their date of formation.  See N.J.S.A. 42:2C-91.

2

providing access to educational services, products, and facilities that enable these institutions to offer their students the best quality education possible. . . ."

PCSST is a public school operating under the New Jersey Charter School Program Act, N.J.S.A. 18A:36A-1 to -18. PCSST received its charter from the New Jersey Department of Education in 2001 however, due to challenges in finding a suitable school building, did not open its doors until the fall of 2003.[4] Initially, PCSST comprised 12 teachers and an enrollment of 147 students, in grades sixth through eighth. In 2005, PCSST relocated to property at 276 Wabash Avenue, Paterson, enabling it to serve up to 588 students, in grades sixth through tenth, with a faculty and staff of fifty-two. In 2009, PCSST was granted approval from the New Jersey Department of Education to serve grades kindergarten through fifth. By late 2011, PCSST reached its maximum enrollment capacity and required a larger school building to continue to expand its public educational programs for the children of Paterson and State of New Jersey.[5]

PCSST identified a potential suitable property at 196 West Railway Avenue, Paterson, New Jersey (the "subject property"). The subject property is designated as Block 6704, Lot 1 on Paterson's municipal tax map. However, PCSST did not have the financial wherewithal to acquire the subject property and make renovations necessary to use it as a school. Accordingly, PCSST partnered with Apple, an organization "founded by educators who have broad experience facilitating the development of public charter school programs," to develop a plan to acquire and finance acquisition of and renovations to the subject property. PCSST and Apple approached the

---

[4] PCSST's original school facility was located at 5-7 Mill Street, Paterson, New Jersey.

[5] Currently, PCSST provides public education services for approximately 1,388 students, in grades kindergarten through twelfth. PCSST maintains a graduation rate exceeding 93%. Enrollment in PCSST is open to all New Jersey school-age children, however preference is required to be given to residents of Paterson.

New Jersey Economic Development Authority ("NJEDA"), to attempt to secure the requisite funding for the subject property, to serve as PCSST's high school campus. The proposed plan involved establishing a single-member/single-purpose New Jersey entity that would: (i) secure loan financing from the NJEDA; (2) use the loan proceeds to acquire title to and renovate the subject property; (iii) grant a mortgage on the subject property to NJEDA as security for the loan proceeds; (iv) lease the subject property to PCSST; and (iv) act as a conduit to repay the NJEDA-sponsored loan.[6] Ultimately, the NJEDA approved the project and loan financing through the sale of approximately $11,945,000 in bonds.

On December 7, 2011, Railway Avenue's Certificate of Formation was filed with the New Jersey Department of Treasury ("Certificate of Formation"). The Certificate of Formation provides that Apple is its sole member, and that at no time shall Railway Avenue "have any other member." The Certificate of Formation further provides the following:

> [Railway Avenue] shall at all times be operated exclusively to further the charitable purposes of Apple Educational Services, Inc[.] within the meaning of Section 501(c)(3) of the Internal Revenue Code . . . and may not carry on activities not permitted to be carried on by an organization described in Section 501(c)(3) of the Code.
>
> At all times the following shall operate as conditions restricting the operations and activities of [Railway Avenue]:
>
> A. No part of the net earnings of [Railway Avenue] shall inure to the benefit of, or be distributable to its members, trustees, officers, or other private persons, except that [Railway Avenue] shall be authorized to pay reasonable compensation for services rendered and to make payments and distributions in furtherance of the exempt purposes set forth in this Certificate of Formation . . .

---

[6] As a part of the project, Railway Avenue also acquired the property at 276 Wabash Avenue, Paterson, New Jersey (the "Wabash Property"). Railway Avenue leases the Wabash Property to PCSST for use as its elementary school campus. Acquisition of the subject property and the Wabash Property were financed through separate NJEDA bond issuances.

4

D. Upon dissolution of [Railway Avenue], Apple Educational Services, Inc. shall, after paying or making provision for the payment of all the liabilities of the Company, dispose of all of the assets of the Company exclusively for the purposes of the Company or to other organizations qualifying as exempt organizations under Section 501(c)(3) of the Code and which organizations pursue any or all of the objectives for which Apple Educational Services, Inc. is established.

E. Notwithstanding anything else herein provided, [Railway Avenue] is organized and shall be operated exclusively to further the tax-exempt purposes of its sole member, Apple Educational Services, Inc. . . . and all purposes or powers herein shall be interpreted and exercised consistent with this intention.

On September 27, 2012, Railway Avenue acquired title to the subject property. Thereafter, on September 28, 2012, Railway Avenue entered into a lease agreement with PCSST for the subject property (the "Lease"). The Lease was for an initial five-year term and provided for six renewal terms of five years each.[7]

The Lease requires PCSST to pay sums defined as "Basic Rent," "Additional Rent," and a "Landlord's Fee" to Railway Avenue. The Basic Rent, Additional Rent, and Landlord's Fee are limited, in the aggregate, to the sum of $1,395,200 annually, which sum is defined as the "Cap Amount." Basic Rent is defined as the total debt service due under the NJEDA bond. The term Additional Rent includes reserve amounts required to be deposited with the NJEDA, or its agent, for maintenance and operation of the subject property. The term Landlord's Fee is defined as "the Cap Amount [$1,395,200] . . . minus the Debt Service and Additional Rent . . ." The rent is due and payable in twelve equal monthly installments of $116,266.67 each.

---

[7] The Lease was silent regarding ownership of the subject property following repayment of the loan to NJEDA. However, in July 2017, the Lease was amended to provide that following repayment of the NJEDA loan, the Lease would terminate and title to the subject property would be conveyed to PCSST.

5

PCSST submits payments under the Lease directly to U.S. Bank, trustee for NJEDA. The Lease payments are used to satisfy the debt service to NJEDA and the additional amounts due under the loan agreement. To the extent that the Lease payments exceed the Basic Rent and Additional Rent, U.S. Bank will remit those funds to Railway Avenue. In turn, Railway Avenue uses those funds to cover its costs of operation and distributes excess funds, if any, to Apple for use in its nonprofit operations. Railway maintains that for the 2015 tax year, it operated at a loss of $983,659.84, and for the 2016 tax year, at a loss of $313,761.56.[8]

Railway Avenue's assets consist solely of the subject property and the Wabash Property. Similarly, Railway Avenue's sole revenue source to repay the NJEDA loans is derived from leasing the two properties to PCSST.

A certificate of occupancy for the subject property was issued to PCSST in or about July 2013, and PCSST has and continues to exclusively occupy the subject property as its high school, educating students in grades seven through twelve. The subject property consists of classrooms, laboratories, computer facilities, and student recreation facilities.

In 2013, Paterson's municipal tax assessor granted the subject property an exemption from local property taxes.[9] The local property tax exemption continued through the 2014 and 2015 tax years. However, sometime during 2015, Paterson's newly appointed tax assessor revoked the subject property's tax exemption and levied an added assessment for the fourth quarter of the 2015 tax year. The 2015 tax year added assessment was as follows:

| | |
|---|---|
| Land: | $ 971,200 |
| Improvement: | $2,390,000 |
| Total Prorated Assessment: | $3,361,200 |

---

[8] Railway Avenue maintains that for the 2017 tax year it operated at a surplus of $177,426.68.

[9] It is unclear from the record before the court whether the 2013 exemption application was made by Railway Avenue or PCSST.

6

Both PCSST and Railway Avenue timely filed tax appeals challenging the 2015 added assessment. For the 2016 tax year, the subject property was assessed as taxable on Paterson's tax roll bearing a total assessment of $3,361,200. Both PCSST and Railway Avenue timely appealed the subject property's 2016 tax assessment.

Paterson moved for entry of summary judgment under R. 4:46-2, arguing that the subject property was taxable during the 2015 and 2016 tax years. Paterson's motion is premised on two main arguments: (1) neither PCSST nor Railway Avenue are entitled to an exemption from local property tax under N.J.S.A. 54:4-3.6 because Railway Avenue is not organized exclusively for a tax-exempt purpose under N.J.S.A. 54:4-3.6; and (2) the Lease of the subject property by Railway Avenue to PCSST evinces Railway Avenue's and Apple's purpose to act as a real estate facilities landlord and to engage in a profit-making activity, rather than serve as an educational institution or organization serving educational institutions.

In response, PCSST cross-moved for summary judgment, arguing that: (1) Railway Avenue is a holding company exempt from taxation under N.J.S.A. 54:4-3.6; (2) the subject property is exempt under the three prong test promulgated in Paper Mill Playhouse v. Millburn Twp., 95 N.J. 503 (1984); (3) the confluence of use and ownership between PCSST and Railway Avenue justifies PCSST's local property tax exemption claim; and (4) the subject property should be exempt from local property tax as a matter of public policy. Railway Avenue joined in PCSST's cross-motion for summary judgment.

On May 11, 2018, at conclusion of oral argument, the court invited the parties to submit supplemental briefs addressing issues raised by the court and afforded the parties a briefing schedule. Both Paterson and PCSST submitted supplemental briefs to the court.

## II.   Conclusions of Law

### A. Summary Judgment

Summary judgment should be granted where "'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the [moving] party is entitled to a judgment or order as a matter of law.'" Alpha I, Inc. v. Dir., Div. of Taxation, 19 N.J. Tax 53, 56 (Tax 2000) (citing R. 4:46-2). Rule 4:46-2 outlines the circumstances under which a motion for summary judgment should be granted:

> if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law.

> [R. 4:46-2.]

In Brill v. Guardian Life Ins. Co. of Am., our Supreme Court adopted the federal approach to resolving motions for summary judgment, in which "the essence of the inquiry is . . . whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." 142 N.J. 520, 536 (1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). In conducting this inquiry, the trial court must engage in a "kind of weighing that involves a type of evaluation, analysis and sifting of evidential materials." Ibid. The standard established by our Supreme Court in Brill is as follows:

> [W]hen deciding a motion for summary judgment under R. 4:46-2, the determination whether there exists a genuine issue with respect to a material fact challenged requires the motion judge to consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party in consideration of the applicable evidentiary standard, are sufficient to permit a

8

rational factfinder to resolve the alleged disputed issue in favor of the non-moving party.

[Id. at 523.]

In considering all of the material evidence before it with which to determine if there is a genuine issue of material fact, the court must view most favorably those items presented to it by the party opposing the motion and all doubts are to be resolved against the movant. Ruvolo v. American Casualty Co., 39 N.J. 490, 499 (1963). The moving party bears the burden "to exclude any reasonable doubt as to the existence of any genuine issue of material fact" with respect to the claims being asserted. United Advertising Corp. v. Metuchen Borough, 35 N.J. 193, 196 (1961). However, if the party opposing the motion merely presents "facts which are immaterial or of an insubstantial nature, a mere scintilla, fanciful, frivolous, gauzy or merely suspicious," then an otherwise meritorious application for summary judgment should not be defeated. Judson v. Peoples Bank and Trust Co., 17 N.J. 67, 75 (1954) (citation and internal quotation marks omitted). Thus, "[b]y its plain language, R. 4:46-2 dictates that a court should deny a summary judgment motion only where the party opposing the motion has come forward with evidence that creates a 'genuine issue as to any material fact challenged.'" Brill, 142 N.J. at 529.

In applying these standards to the motions and cross-motions for summary judgment, the court concludes that no genuine issues of material fact are in dispute with respect to the organization of the entities, ownership of the subject property, use of the subject property, or the content of the agreements that exist between the parties. Rather, the issues presented involve an interpretation and application of relevant law and therefore, are ripe for disposition by summary judgment.

In sum, the legal issues facing the court are: (1) whether Railway Avenue, a New Jersey limited liability company, may qualify for local property tax exemption under N.J.S.A. 54:4-3.6;

9

(2) whether Railway Avenue's organizational documents reflect that it is an association created for the purpose of holding title to property actually and exclusively used in the work of two or more associations organized exclusively for the moral and mental improvement of men, women and children under N.J.S.A. 54:4-3.6; (3) whether PCSST, under a confluence of use and ownership of the subject property, is entitled to exemption; and (4) whether PCSST is organized specifically to carry out the purposes for which exemption is being claimed: (a) as a school, or academy, or (b) for the moral and mental improvement of men, women, and children.

   B.  Local Property Tax Exemption

Unless expressly exempted by our Legislature, "[a]ll property real and personal. . . shall be subject to taxation annually. . . ."  N.J.S.A. 54:4-1.  Our State's Constitution of 1947 expressly limits the Legislature's authority to grant an exemption from local property tax, providing in part, that "[e]xemption from taxation may be granted only by general laws."  N.J. Const. art. VIII, § 1, ¶ 2.  Thus, the grant of local property tax exemption represents a significant departure from the principle of equality of treatment and the duty to share the tax burden.

Significantly, in considering the grant of a local property tax exemption, our laws "must base exemptions on the property's use, not the owner's identity."  Holmdel Twp. v. New Jersey Highway Authority, 190 N.J. 74, 87 (2007).  Consequently, tax exemption statutes, which are "based on the personal status of the owner rather than on the use to which the property is put, run afoul of" our State's Constitutional mandate that all property be "assessed for taxation under general laws and by uniform rules."  New Jersey Turnpike Auth. v. Washington Twp., 16 N.J. 38, 44-45 (1954) (citation and internal quotation marks omitted).

N.J.S.A. 54:4-3.6 affords the following uses of property an exemption from local property tax stating, in pertinent part, that:

10

all buildings actually used for colleges, schools, academies or seminaries, provided that if any portion of such buildings are leased to profit-making organizations or otherwise used for purposes which are not themselves exempt from taxation, said portion shall be subject to taxation and the remaining portion only shall be exempt. . .

all buildings actually used in the work of associations and corporations organized exclusively for the moral and mental improvement of men, women and children, provided that if any portion of a building used for that purpose is leased to profit-making organizations or is otherwise used for purposes which are not themselves exempt from taxation, that portion shall be subject to taxation and the remaining portion only shall be exempt. . .

all buildings owned or held by an association or corporation created for the purpose of holding the title to such buildings as are actually and exclusively used in the work of two or more associations or corporations organized exclusively for the moral and mental improvement of men, women and children…

[N.J.S.A. 54:4-3.6.]

Moreover, N.J.S.A. 54:4-3.6 expressly states that local property tax exemption shall apply:

only where the association, corporation or institution claiming the exemption owns the property in question and is incorporated or organized under the laws of this State and authorized to carry out the purposes on account of which the exemption is claimed. . . .

[N.J.S.A. 54:4-3.6.]

Because exemption from local property tax represents such a departure from our State's constitutional tenets and compelling public policy principles, tax exemption statutes are strictly constructed against the claimant. Accordingly, the burden rests with the claimant to prove entitlement to local property tax exemption. Princeton Univ. Press, 35 N.J. at 214; N.J. Carpenters Apprentice Training & Educ. Fund v. Borough of Kenilworth, 147 N.J. 171, 177-78 (1996), cert. denied, 520 U.S. 1241 (1997).

However, the "raison d'etre for [affording taxpayers] statutory exemptions from taxation is the benefit conferred upon the public by such religious, charitable or other similar institutions

11

and the consequent relief, . . . of the burden imposed on the state to care for and advance the interest of its citizens." Grace & Peace Fellowship Church, Inc. v. Cranford Twp., 4 N.J. Tax 391, 399 (Tax 1982). Thus, in New Jersey, the grant of a local property tax exemption is viewed as a quid pro quo, for the taxpayer's performance of an essential public service. See Carteret Acad. v. State Bd. of Taxes & Assessment, 102 N.J.L. 525, 528 (Sup. Ct. 1926) ("[T]he concession is due as quid pro quo for the performance of a service essentially public, and which the state thereby is relieved . . . from the necessity of performing."), aff'd, 104 N.J.L. 165 (E & A 1927); see also Roman Catholic Diocese of Newark v. Borough of Ho-Ho-Kus, 42 N.J. 556, 566 (1964) ("The exemption is granted by the State because of the contribution of the exempt facility to the public good.").

Therefore, in gauging whether a property is entitled to local property tax exemption our courts have adopted a three-part test: "'(1) [the owner of the property] must be organized exclusively for the [exempt purpose]; (2) its property must be actually . . . used for the tax-exempt purpose; and (3) its operation and use of its property must not be conducted for profit.'" Hunterdon Medical Center v. Readington Twp., 195 N.J. 549, 561 (2008) (quoting Paper Mill Playhouse, 95 N.J. at 506); See also Center for Molecular Medicine and Immunology v. Belleville Twp., 357 N.J. Super. 41, 50 (App. Div. 2003).

      1. Ownership; Organized Exclusively for Exempt Purpose

      a. PCSST

Applying the three-part test under the statute, PCSST fails to satisfy the ownership requirement to be exempt from taxation as a school, or as a building for the moral and mental improvement of men, women, and children.[10] N.J.S.A. 54:4-3.6. Simply stated, PCSST is not the

---

[10] PCSST claims exemption under N.J.S.A. 54:4-3.6 as: (1) "all buildings actually used for colleges, schools, academies or seminaries. . . ."; and (2) "all buildings actually used in the work

owner of the subject property. As outlined above, Railway Avenue is the owner of the subject property and PCSST is its lessee. Thus, under a plain reading of the statute, PCSST does not meet the statutory criteria, nor satisfy the first prong of the three-part Paper Mill Playhouse test.

Despite its status as lessee, PCSST contends that "it is well established that an entity claiming exemption need not be the title owner of property where such a requirement 'would lead to a result incompatible with the legislative purposes' of the exemption statute." (quoting Center for Molecular Medicine and Immunology, 357 N.J. Super. at 48)("CMMI"). However, PCSST's reliance on CMMI, is misplaced as the facts in that matter are readily distinguishable from the instant matter.

In CMMI, the property's owner, Essex County, executed "deeds" conveying a possessory interest in and to the property to CMMI, a nonprofit cancer research organization. 357 N.J. Super. at 45. The court examined the substance and content of the "deeds," concluding that they were a lease. Id. at 50-51. Thus, CMMI, was regarded as having leased the property from Essex County for an initial term of 25 years, with three irrevocable options to renew for 30 years each. The court emphasized that the "combination of the 'deeds' and lease creates a tenancy [between Essex County and CMMI] for 115 years." Id. at 51.

Focusing on the purposes and objectives sought to be achieved by our Legislature, the court found that the statutory ownership requirement was intended to prevent abuses of the local property tax exemption statute. Id. at 53-54. However, the court concluded that "a construction of ownership [requirement] to include 99-year leases would have no adverse effect on the legislative purpose." Id. at 54. The court explained that the unique circumstances of the case

---

of associations and corporations organized exclusively for the moral and mental improvement of men, women and children. . ."

created "a situation unanticipated by the drafter" of N.J.S.A. 54:4-3.6." Ibid. Given the purposes sought to be achieved by N.J.S.A. 54:4-3.6, the court inferred that the "ownership requirement is satisfied by allowing for exemption in such cases, at least where the owner remains a public entity." Ibid. (emphasis added). Thus, the court defined the narrow parameters under which a lease agreement would satisfy the ownership requirements of N.J.S.A. 54:4-3.6. First, there must be a long-term lease agreement sufficient to equate to an ownership interest in the property. Second, the actual owner of the property must be a public entity, agency, department, or instrumentality thereof.

Thus, there two material facts distinguishing PCSST and the taxpayer in CMMI: (1) the duration of PCSST's lease was for a total term of thirty-five years; and (2) Railway Avenue, the owner of the subject property, is not a public entity.

Here, the court does not find that PCSST's thirty-five year lease is equivalent to a fee ownership interest in the subject property. It cannot be said that a lease for an initial five year term, containing six option terms of five years each, is unique in a commercial setting. Additionally, during the tax years at issue, the Lease afforded PCSST customary tenancy rights including possession, use, and enjoyment, but no legal or equitable right of ownership.[11] In the event of default under the Lease, Railway Avenue enjoyed the right to dispossess PCSST and to recover possession of the subject property. Thus, PCSST's right to possess the subject property

---

[11] The Lease between Railway Avenue and PCSST was silent regarding ownership of the subject property following repayment of all sums due NJEDA. However, on June 16, 2017, PCSST and Railway Avenue executed a Fifth Amendment to Lease that provides title to the subject property will be conveyed to PCSST, for nominal consideration, following repayment of all sums due NJEDA. However, because the instant matters involve challenges to the subject property's 2015 added assessment and 2016 tax year assessment, the court finds that consideration of the Fifth Amendment to Lease, entered into more than 20 months following the October 1, 2015 valuation date, would be inappropriate.

14

was dependent upon its corresponding obligation to pay rent and other charges due and owing under the Lease. More importantly, Railway Avenue, the owner of the subject property, is not a public entity. Railway Avenue is a New Jersey limited liability company. It is not a public entity, agency, department or instrumentality thereof. In CMMI, the court expressly limited the scope and breadth of its ruling to tenancies where the "owner remains a public entity." 357 N.J. Super. at 54.

In sum, the court finds that PCSST does not satisfy the ownership requirements under N.J.S.A. 54:4-3.6, as contemplated in CMMI. For this reason, PCSST fails to satisfy the criteria for exemption as a school, or as a building actually used in the work of associations and corporations organized exclusively for the moral and mental improvement of men, women, and children under N.J.S.A. 54:4-3.6.

PCSST further posits that "the confluence of use and ownership between [PCSST] and Railway Avenue justifies [PCSST's] exemption claim," relying on the holding in Mega Care Inc. v. Union Twp., 15 N.J. Tax 566 (Tax 1996), aff'd, 22 N.J. Tax 604 (App. Div. 2004).

In Mega Care Inc. the owner and operator of a skilled nursing home and hospital, challenged the local property tax assessment imposed on its facilities. However, Mega Care, Inc.'s certificate of incorporation failed to "include hospital operations among its stated corporate purposes." Id. at 568. Highlighting that the plain language of the exemption statute requires a property to be "used in the work of associations and corporations organized exclusively for hospital purposes," the court emphasized that "exemption requires a confluence of ownership and use." Id. at 573. The court further observed that this requirement is intended "to assure that exempt property is not only put to an eligible use, but also that it is held for and appropriated to the user's exempt purposes." Id. at 574.

15

The use and ownership requirements are satisfied "with respect to the property of a subsidiary or commonly controlled affiliate of an exempt entity, if the affiliate's operations are limited to support that entity." Ibid. The court stated that, although no distinct language is required:

> the substance of an organic integration of the entities must be reflected in the affiliate's corporate charter. If this condition is satisfied, N.J.S.A. 54:4-3.6 does not preclude exemption for property actually used for hospital purposes, but operated through a subsidiary or affiliate of the hospital, rather than by the hospital itself.
>
> [Id. at 574.]

Mega Care Inc.'s certificate of incorporation was not sufficiently limited to include the performance of hospital services. Therefore, the court concluded that the lack of integration between the skilled nursing home and the hospital was insufficient to support a claim for local property tax exemption. Id. at 575.

Here, PCSST maintains that it satisfies the 'ownership' requirement under N.J.S.A. 54:4-3.6 due to a confluence of use and ownership of the subject property with Railway Avenue. However, the facts in the instant matter do not demonstrate that any relationship exists between Railway Avenue and PCSST analogous to that of a parent/subsidiary or subsidiary and affiliate. Significantly, PCSST has no ownership interest in, nor control over Railway Avenue. Apple formed Railway Avenue as a single-purpose entity to acquire title to and renovate the subject property, and lease it to PCSST. Apple is the sole member of Railway Avenue and under its Certificate of Formation no other member is permitted. Thus, PCSST possesses no interest and/or rights in Railway Avenue. The legal relationship between Railway Avenue and PCSST is that of landlord and tenant, and not a commonly controlled affiliate. In sum, Railway Avenue and PCSST are not subsidiaries, nor commonly controlled affiliates of an exempt entity.

16

Additionally, PCSST is organized to operate a public charter school within New Jersey. Conversely, Apple's organizational purpose, is to "help improve the quality of educational institutions by providing access to educational services, products, and facilities that enable these institutions to offer their students the best quality education possible." Although the functions and purposes for which Apple is organized may be complementary to, and aid a public or private school, neither Apple, nor Railway Avenue are authorized to operate a public or private school. Here, PCSST exclusively operates a public charter school on the subject property. Thus, it cannot be said that a unity exists between Railway Avenue's ownership and PCSST's use of the subject property.

For the foregoing reasons, the court concludes that PCSST has failed to satisfy the ownership requirement for local property tax exemption under N.J.S.A. 54:4-3.6.

b. Railway Avenue

As recited above, in order to satisfy the three-part test under Hunterdon Medical Center, 195 N.J. at 561, the entity claiming the local property tax exemption must own the property; be organized under New Jersey law; and be authorized to carry out the purpose for which exemption is being claimed. See N.J.S.A. 54:4-3.6.

i. Organizational structure; Ownership

Paterson argues that because Railway Avenue is a New Jersey limited liability company, rather than a corporation, its organizational structure is fatal to its exemption claim. In support of this position, Paterson relies on Fountain House of New Jersey, Inc. v. Montague Twp., 13 N.J. Tax 387 (Tax 1993), and Advance Housing, Inc. v. Teaneck Twp., 215 N.J. 549 (2013).

In Fountain House of New Jersey, Inc., the taxpayer, a New Jersey corporation, incorporated under N.J.S.A. 15A:2-1 to -12, and was organized for the purpose of "help[ing]

17

discharged mental patients, to provide and maintain grounds and premises for their social and vocational rehabilitation." Id. at 391. In examining the statutory prerequisites for exemption under N.J.S.A. 54:4-3.6, the court stated that:

> '[o]rganized exclusively,' as used to describe a corporation whose real property is exempt from local property taxation, is therefore, a two-pronged test. A corporation entitled to the exemption will be one which is: (1) *formally incorporated* under Title 15A (or its predecessor Title 15) and thereafter, (2) *conducted exclusively* for the accomplishment of one or more purposes qualifying for exemption under N.J.S.A. 54:4-3.6. An entity whose N.J.S.A. 54:4-3.6 exemption is based upon its moral improvement purpose will meet the first prong of the organization test by demonstrating formal compliance with the provisions of Title 15A (Title 15) (N.J.S.A. 15A:2-1 to -12) and an exclusive purpose which fits within the definition of the 'moral and mental improvement' category of the statute.
>
> [Fountain House of New Jersey, Inc., 13 N.J. Tax at 400 (emphasis in original).]

Thus, contrary to Paterson's contention, the court does not read the holding in Fountain House of New Jersey, Inc. so narrowly as to operate as an automatic prohibition against unincorporated entities, formed and organized under New Jersey law, from being entitled to exemption under N.J.S.A. 54:4-3.6. The court's statement that "formal[] incorporat[ion]" is required was expressly limited to corporate applicants, as evidenced from the immediately preceding language, "as used to describe a corporation." Id. at 400. Additionally, in Fountain House of New Jersey, Inc. the court observed that real property may be "owned by an individual, two or more individuals or by an entity recognized under New Jersey law." 13 N.J. Tax at 397. Significantly however, the court's conclusions predated the effective date of the New Jersey Limited Liability Company Act, N.J.S.A. 42:2B-1 to -70 (eff. Jan. 26, 1994), which expressly recognized a new form of entity, and its capacity to hold title to real property in New Jersey. Thus, although the court expressed in a footnote that the phrase "'associations and corporations' may, in

18

general, be read 'corporations,'" this conclusion stemmed from its finding that Title 15A, New Jersey Nonprofit Corporation Act, N.J.S.A. 15A:1-1 to -10, was inapplicable to unincorporated associations. 13 N.J. Tax at 397, n.7. However, as neither the New Jersey Limited Liability Company Act, nor the Revised Uniform Limited Liability Company Act were effective as of the date of the court's decision, no consideration was given by that court to the impact that limited liability companies had on N.J.S.A. 54:4-3.6.

More importantly, the court finds that the plain language of the statute is clear and unambiguous, "the association, corporation or institution claiming the exemption" must: (1) own the property in question; (2) be "incorporated or organized under the laws of this State;" and (3) authorized to carry out the purposes for which exemption is being claimed. N.J.S.A. 54:4-3.6 (emphasis added).

Similarly, our Supreme Court observed in Advance Housing, Inc., that the criteria for exemption from taxation require only that "[r]eal property [is] owned by a non-profit, charitable organization, which is used exclusively for charitable purposes 'as defined by law.'" 215 N.J. at 566 (quoting N.J. Const., art. VIII, § 1, ¶ 2) (emphasis added).

Finally, this court is reminded of our Supreme Court's conclusion in Holmdel Twp. v. New Jersey Highway Authority, in considering the grant of a local property tax exemption, our laws "must base exemptions on the property's use, not the owner's identity." 190 N.J. at 87 (emphasis added).

Therefore, this court concludes that the association, corporation, or institution claiming the exception must be incorporated or organized under New Jersey law. Under both the statutory scheme and legal authority, this court finds that no requirement exists that an entity, association, or institution be 'incorporated' in order to obtain an exemption. If the applying organization has

19

elected to be treated as a corporation, then it must comply with New Jersey's formal statutory organizational requirements. See N.J.S.A. 15A:2-1 to -12. Conversely, if the entity has elected an alternate structure, it must nonetheless be duly organized in accordance with New Jersey law.

Here, it is undisputed that Railway Avenue is the owner of the subject property, having acquired title to the subject property by deed dated September 27, 2012. Moreover, it is undisputed that Railway Avenue is not a corporation, but a New Jersey limited liability company, having been organized and filed its Certificate of Formation on December 7, 2011. Therefore, the court finds that Railway Avenue is the owner of the subject property and an entity "organized under the laws of this State" as required under N.J.S.A. 54:4-3.6.

ii. Authorized to carry purposes for which exemption is claimed

The Revised Uniform Limited Liability Company Act, N.J.S.A. 42:2C-1 to -17, governs limited liability companies organization and purposes, regardless of their date of formation.[12] See N.J.S.A. 42:2C-91. In enacting the Revised Uniform Limited Liability Company Act, our Legislature authorized limited liability companies to operate for "any lawful purpose, regardless of whether for profit." N.J.S.A. 42:2C-4(b) (emphasis added).[13] The phrase "regardless of whether for profit" is not defined under the statute, and this court has been unable to discern any legal precedent addressing the interpretation of such phrase. However, the rules of statutory construction require "consideration of [a statute's] plain language." Merin v. Maglaki, 126 N.J.

---

[12] Railway Avenue's Certificate of Formation was filed under the New Jersey Limited Liability Company Act, N.J.S.A. 42:2B-1 [Repealed].

[13] Several states have recently enacted legislation that expressly authorizes the formation and use of nonprofit limited liability companies. See Cassady V. Brewer, Lisa A. Runquist, and Elizabeth Carrott Minnigh, Nonprofit LLC's, Business Law Today, March 2017; See also KY. Rev. Stat. Ann. §§ 275.520-540 (2017); Minn. Stat. § 322B.975 (2017); N.D. Cent. Code §§ 10-36-01 (2017); Tenn. Code Ann. § 48-101-809 (2017).

430, 435 (1992).  See also Kimmelman v. Henkels & McCoy, Inc., 108 N.J. 123, 128 (1987); In re Plan for the Abolition of Council on Affordable Hous., 214 N.J. 444, 467-68 (2013).  If based on a plain reading, the statutory language is "clear and unambiguous," the court must "implement the statute as written without resort to judicial interpretation, rules of construction, or extrinsic matters."  Bergen Commercial Bank v. Sisler, 157 N.J. 188, 202 (1999) (quoting In re Estate of Post, 282 N.J. Super. 59, 72 (App. Div. 1995)).  Conversely, if the "plain language of a statute creates uncertainties or ambiguities, a reviewing court must examine the legislative intent underlying the statute and 'construe the statute in a way that will best effectuate that intent.'"  Musikoff v. Jay Parrino's the Mint, L.L.C., 172 N.J. 133, 136 (2002) (quoting New Jersey State League of Municipalities v. Department of Community Affairs, 158 N.J. 211, 224 (1999)).  It is of paramount importance for the court to effectuate "the 'fundamental purpose for which the legislation was enacted.'"  Twp. of Pennsauken v. Schad, 160 N.J. 156, 170 (1999).

Here, the court finds that the plain language of the statute is clear and unambiguous.[14] Under the former New Jersey Limited Liability Company Act, a limited liability company was limited to "carry[ing] on any lawful business, purpose or activity."  N.J.S.A. 42:2B-8, repealed by L. 2012, c. 50 § 95 (eff. March 1, 2014).  By amending the statute and adding the phrase "regardless of whether for profit," our Legislature seemingly intended to afford entities the right to organize as limited liability companies, for lawful purposes unrelated to their profit motives.  Thus, our Legislature afforded limited liability companies broad discretion in their organizational objectives, and had they intended to preclude them from operating for tax-exempt purposes, the statute could have so expressly provided.  However, no such limitation is expressly stated or implied in the

---

[14]  The legislative history of the Revised Uniform Limited Liability Company Act, N.J.S.A. 42:2C-1 to -17, provides no meaningful insight into the intent of our Legislature in including the phrase "regardless of whether for profit."

statutory scheme. Thus, provided that a New Jersey limited liability company is duly organized for any lawful purpose under the statute, its agenda to, or not to generate a pecuniary profit is not material to its formation. As a consequence, the court finds that the organization of a limited liability company under the Revised Uniform Limited Liability Company Act does not, per se, preclude it from organizing and operating for a tax-exempt purpose.

### iii. Organized exclusively for tax-exempt purpose

Paterson further argues that Railway Avenue is not organized exclusively for a tax-exempt purpose and therefore, fails to satisfy the criteria for exemption under N.J.S.A. 54:4-3.6. In support of this position, Paterson extensively relies on the Appellate Division's unpublished decision in 1785 Swarthmore, LLC v. Lakewood Twp., 2015 N.J. Super. Unpub. LEXIS 2478.[15]

Conversely, Railway Avenue maintains that its Certificate of Formation, unlike the certificate of formation addressed by the court in 1785 Swarthmore, LLC, is narrowly written and more precise in its tax-exempt purposes. It therefore submits that this critical distinction results in Railway Avenue being "precisely the type of entity that the Swarthmore [c]ourt posited would likely be qualified for tax exemption. . ."

Accordingly, although the decision in 1785 Swarthmore, LLC, is unpublished and not precedential, because both Paterson and Railway Avenue have extensively argued the applicability of the principles expressed therein to the instant matters, the court finds that a discussion of the court's holding in that matter is warranted.

---

[15] "[N]o unpublished opinion shall constitute precedent or be binding upon any court." R. 1:36-3, see also Trinity Cemetery Assoc. v. Twp. of Wall, 170 N.J. 39, 48 (2001) (concluding that an unreported decision serves no precedential value and cannot reliably be considered part of our common law).

22

1785 Swarthmore, LLC ("Swarthmore"), was a single member New Jersey limited liability company, and its sole member was a New Jersey nonprofit corporation. Swarthmore's certificate of formation stated that it was organized "to engage in <u>any activity</u> within the purposes for which Limited Liability Companies may be formed pursuant to the New Jersey Limited Liability Company Act." <u>Id.</u> at *2-*3 (emphasis added). Additionally, Swarthmore's operating agreement specified that its purpose was to "conduct[] *any* legal business enterprise." <u>Id.</u> at *2-*3 (emphasis in original). After formation, its single member conveyed to Swarthmore all of its right and title in and to a certain parcel of real property, for nominal consideration. <u>Id.</u> at *3. The municipality denied Swarthmore's tax exemption claim and a tax appeal ensued. <u>Id.</u> at *4. The Tax Court denied the exemption claim, concluding that Swarthmore failed to demonstrate it was organized exclusively for charitable or religious purposes and therefore, did not satisfy the criteria for exemption under N.J.S.A. 54:4-3.6. <u>Ibid.</u>

On appeal, the Appellate Division rejected Swarthmore's argument that its status as a single member limited liability company and consequently, a disregarded entity for income tax purposes, should result in the single member being viewed as the property owner. <u>Id.</u> at *16-17. Significantly however, the Appellate Division highlighted that Swarthmore "was not formed explicitly for a nonprofit purpose . . . [t]herefore, . . . the organizational purpose and the ownership elements of the exemption statute's first prong are not met. . ." <u>Id.</u> at *16. The court further emphasized that:

> Swarthmore did not specifically limit its stated purposes to any extent in its Certificate of Formation. . . Swarthmore's stated purpose was very broad. . . [h]ence, <u>Swarthmore could have been formed and operated for any number of non-exempt purposes</u> and thus has not satisfied the organizational purpose requirement under the statute.
>
> [<u>Id.</u> at *21 (emphasis added).]

23

Although the Appellate Division acknowledged that Swarthmore satisfied the second and third prongs of the criteria for exemption enumerated in Hunterdon Medical Center, 195 N.J. at 561, the broad expanse of Swarthmore's organizational documents, permitting it to engage in any lawful purpose and engage in any legal business enterprise, failed to demonstrate that it was organized exclusively for a tax-exempt purpose. 1785 Swarthmore, LLC, at *21-22.[16]

Here, Railway Avenue's sole member, Apple, is a New York nonprofit corporation authorized to transact business in New Jersey. Significantly, Railway Avenue's Certificate of Formation restricts its "operat[ion] exclusively to further the charitable purposes of Apple Educational Services, Inc. . . ."[17] Moreover, Railway Avenue's Certificate of Formation further expressly provides that:

> A. No part of the net earnings of [Railway Avenue] shall inure to the benefit of, or be distributable to its members, trustees, officers, or other private persons, except that [Railway Avenue] shall be authorized to pay reasonable compensation for services rendered and to make payments and distributions in furtherance of the exempt purposes set forth in this Certificate of Formation . . .
>
> E. Notwithstanding anything else herein provided, [Railway Avenue] is organized and shall be operated exclusively to further the tax-exempt purposes of its sole member, Apple Educational Services, Inc. . . .

Thus, Railway Avenue's Certificate of Formation exclusively limits its purpose to furthering the charitable and tax-exempt objectives of Apple. Unlike Swarthmore, Railway Avenue cannot be operated for-profit or for a non-charitable purpose. Stated differently, Railway

---

[16] The Appellate Division's opinion did directly not address whether Swarthmore's organization, as a limited liability company, will bar or prohibit local property tax exemption consideration.

[17] During oral argument, counsel for Railway Avenue represented to the court that Railway Avenue has no operating agreement.

24

Avenue was organized and aligned in a manner that was consistent with Apple's tax-exempt purpose, to "improve the quality of educational institutions by providing access to educational services, products, and facilities that enable these institutions to offer their students the best quality education possible. . . ." Railway Avenue was formed as a single-purpose New Jersey limited liability company, designed to acquire and hold title to two parcels of real estate, and to lease that real estate to PCSST. Additionally, unlike Swarthmore, Railway Avenue directly acquired, in an arms-length transaction, ownership in the subject property in order to further its purposes and correspondingly, the tax-exempt purposes and objectives of Apple. Therefore, the court finds that Railway Avenue's organization and operation demonstrates that it was "sufficiently integrated" with that of Apple so as to be an "integral part of operating" Apple. See Mega Care, Inc., 15 N.J. Tax at 569 (quoting Intercare Health Sys. v. Cedar Grove Twp., 11 N.J. Tax 423 (Tax 1990), aff'd, 12 N.J. Tax 273 (App. Div. 1991), certif. denied, 127 N.J. 558 (1992)).

In sum, independent of the Appellate Division's ruling in 1785 Swarthmore, LLC, this court concludes that Railway Avenue is organized exclusively for the tax-exempt purpose.

Therefore, the court finds that Railway Avenue satisfies the ownership, organizational, and exclusivity requirements for entities claiming exemption under N.J.S.A. 54:4-3.6. However, that does not end the courts inquiry, Railway Avenue must also satisfy the requirements for the qualifying tax-exempt purpose under N.J.S.A. 54:4-3.6. Specifically, Railway Avenue alleges that it qualifies for tax exemption:

> [as] a holding company established for the purpose of holding title
> to the subject property, which is actually and exclusively used in the
> work of Paterson Charter and Apple, which are both exclusively
> organized for the moral and mental improvement of men, women,
> and children;

by virtue of its incorporation of Apple's charitable purposes, meets the exclusive purpose requirement of the moral and mental improvement clause; and

[by] use of the [subject property] as a school.

#### iv. Holding company

The holding company exemption under N.J.S.A. 54:4-3.6 requires the following:

all buildings owned or held by an association or corporation created for the purpose of holding the title to such buildings as are actually and exclusively used in the work of two or more associations or corporations organized exclusively for the moral and mental improvement of men, women and children…

[N.J.S.A. 54:4-3.6]

Thus, this exemption requires that the subject property be actually and exclusively used in the work of two or more entities that are organized exclusively for the moral and mental improvement of men, women, and children. Notably, this exemption provision does not impose on the holding company an exempt purpose, other than "holding the title to such buildings." However, the entities or organizations must actually and exclusively use the building and be organized exclusively for the moral and mental improvement of men, women and children.

Railway Avenue maintains that it is a single-purpose entity, formed as a real estate holding company for Apple. Railway Avenue further asserts that Apple is organized to provide educational institutions with access to facilities, thereby enabling the institutions to provide the best quality education possible. Thus, Apple's organizational purpose, coupled with PCSST's exclusive use of the subject property as a public charter high school, satisfies the criteria for exemption.

It is uncontested that Railway Avenue is the fee owner of the subject property, and maintains no other assets (except title to the Wabash Property containing PCSST's elementary school campus). Moreover, the NJEDA bond issuance documents provide, in part, that:

26

THE BORROWER [RAILWAY AVENUE] IS A SINGLE PURPOSE ENTITY AND SUBSIDIARY OF APPLE [], A NEW YORK NON-PROFIT CORPORATION AUTHORIZED TO DO BUSINESS IN [NEW JERSEY], AND WILL HAVE NO OPERATIONS AND NO ASSETS EXCEPT FOR THE WABASH AVENUE FACILITIES AND THE [SUBJECT PROPERTY] PROJECT FACILITIES. . .

Additionally, in defining the "Project" funded, the bond issuance documents state, in part, that:

The Bonds will fund the acquisition and renovation of a property located at 196 West Railway Avenue, Paterson, New Jersey, which will be leased by [Railway Avenue] to [PCSST] to use as a campus in addition to the campus located at 276 Wabash Avenue, Paterson, New Jersey, as well as funding a debt service reserve fund and the costs of issuing the Bonds.

Thus, the court is satisfied from the proofs presented that, from its inception that Railway Avenue was conceived as a single-purpose, single owner entity, designed for the purposes of: securing the NJEDA loan; acquiring title to the subject property; and leasing it to PCSST for use as its public charter high school campus. The court further finds that Railway Avenue's acquisition, execution of loan documents, renovations, and leasing of the subject property to PCSST, are consistent with the purposes and objectives of a real estate holding company.

Additionally, it is undisputed that PCSST exclusively uses the subject property to operate a public charter school, serving children in grades kindergarten through twelfth, under a charter issued by the New Jersey Department of Education, under the New Jersey Charter School Program Act, N.J.S.A. 18A:36A-1 to -18. This use of the subject property, is consistent with PCSST's and Apple's organizational purposes and goals, to provide a beneficial, stable, and suitable educational environment for children.[18] Thus, PCSST provides one of the most fundamental and crucial

---

[18] Paterson does not assert that the subject property is not being exclusively used by PCSST as a public charter high school.

aspects of public service, the teaching and education of our children. Correspondingly, Paterson is being relieved of having to provide an essential public service, educational programs for approximately 1,388 students, in grades kindergarten through twelve. See Carteret Acad., 102 N.J.L. at 528; Roman Catholic Diocese of Newark, 42 N.J. at 566. Thus, the court finds that the subject property is actually being used for by PCSST for the tax-exempt purpose and a quid pro quo is being afforded to Paterson stemming from the actual use of the subject property.

The evidence further demonstrates that PCSST and Apple jointly approached the NJEDA and devised the plan to "finance the acquisition and renovation of [the subject property]. The bond offering statement reflects that Railway Avenue "is a single purpose entity and subsidiary of Apple Educational Services, Inc., a New York non-profit corporation authorized to do business in [New Jersey]" and that the "project facilities [subject property] will be leased by [Railway Avenue] to [PCSST], a New Jersey charter school."

Accordingly, the court is satisfied that: (1) the subject property is owned by Railway Avenue, an entity created for the purpose of holding title to real property; (2) PCSST, actually and exclusively uses the subject property for the tax-exempt purpose - the moral and mental improvement of men, women, and children; and (3) the charitable and tax-exempt purposes and goals of both Apple and PCSST are furthered by PCSST's use of the subject property as a public charter high school. Therefore, the sole question remaining for the court is whether Apple is organized exclusively for the moral and mental improvement of men, women, and children. See N.J.S.A. 54:4-3.6.

When determining whether an entity is organized exclusively for a tax-exempt purpose, the status of the entity, as exempt from federal income taxation under Section 501(c)(3) of the Internal Revenue Code, has no bearing on local property tax exemption. See Presbyterian Homes

28

of the Synod v. Division of Tax Appeals, 55 N.J. 275 (1970). Instead, the court must look "to the entity's organizational documents, which include the by-laws as well as the Articles of Incorporation." Phillipsburg Riverview Organization, Inc. v. Phillipsburg Town, 26 N.J. Tax 167, 176 (Tax 2011), aff'd, 27 N.J. Tax 188 (App. Div. 2013). The court must be satisfied from its review of the entity's organizational documents that its purposes align with the statutory requirements of N.J.S.A. 54:4-3.6. Id. at 176.

Here, Apple's Restated Certificate of Incorporation, dated July 22, 2013 states, in part:

> SECOND: [Apple] is a corporation as defined in subparagraph (a)(5) of Section 12 of the Not-for-Profit Corporation Law.
>
> THIRD: [Apple] is a nonprofit corporation and is not organized for the private gain of any person. The specific purpose of [Apple] is to help improve the quality of educational institutions by providing access to educational services, products, and facilities that enable these institutions to offer their students the best quality education possible.
>
> EIGHTH: . . .[Apple] is formed exclusively for educational purposes, as specified in section 501(c)(3) of the Internal Revenue Code, and shall not carry on activities not permitted to be carried by an organization exempt from Federal Income Tax under code section 501(c)(3). . .
>
> NINTH: No part of the net earnings of [Apple] shall inure to the benefit of, or be distributable to its members, trustees, officers, or other private persons, except that compensation for services rendered and to make payment and distributions in furtherance of the exempt purposes set forth in this certificate of incorporation.

Thus, Apple is organized for the specific purpose of improving the quality of educational institutions, by affording them access to educational services, products, and facilities.[19] The court therefore is satisfied that Apple's organization as a New York nonprofit corporation, authorization

---

[19] The court was provided with a copy of Apple's Restated Certificate of Incorporation and Independent Auditors' Report and Consolidated Financial Statements for the 2013 and 2014 years, however was not supplied with a copy of its Bylaws.

to do business in New Jersey, together with the limitations imposed on its usage of funds, and vision to foster an educational institutions ability to offer their students the best educational experience possible, demonstrates that Apple is a corporation organized exclusively for the moral and mental improvement of men, women, and children under N.J.S.A. 54:4-3.6.

Consequently, the court concludes that PCSST and Apple are entities organized exclusively for the moral and mental improvement of men, women, and children; that Railway Avenue, the owner of the subject property, is being used as a holding company to facilitate the purposes and goals of PCSST and Apple; and that the subject property is actually and exclusively being used to further PCSST's and Apple's purposes and goals for the benefit the moral and mental improvement of men, women, and children.

Finding that Railway Avenue satisfies the ownership, organizational, use, and purpose requirements for the holding company exemption, the court must next determine whether Railway Avenue satisfies the nonprofit criteria under the Paper Mill Playhouse and Hunterdon Medical Center tests.

### v. Not-for-Profit Operation

Paterson maintains that it is entitled to summary judgment because Railway Avenue's operation of the subject property is conducted for-profit. Specifically, Paterson highlights that Railway Avenue derives a revenue stream from the subject property's Lease to PCSST and therefore, does not pass the not-for-profit operations test.

In response, Railway Avenue maintains that it is a limited liability company organized exclusively to support the charitable and tax-exempt purposes of its parent, Apple. Moreover, Railway Avenue asserts that no profit has been generated from its operation, instead it has incurred a loss during all tax years at issue. Additionally, Railway Avenue charges that all payments made

30

by PCSST under the Lease and any revenue generated therefrom are "applied exclusively to support the nonprofit activities" of Railway Avenue and its nonprofit parent corporation, Apple.

In Paper Mill Playhouse, our Supreme Court addressed the distinction between the generation of revenue by a nonprofit organization and the for-profit activities of a commercial enterprise. 95 N.J. at 514-515. Paper Mill Playhouse, a New Jersey nonprofit corporation, was organized to "promote 'a greater interest in and a greater appreciation of art, music, drama, history, literature, education and the theater [in New Jersey].'" Id. at 507. Paper Mill was governed by a Board of Trustees who served without compensation. Id. at 519. The theatrical operations were overseen by an executive producer, who decided which productions will be performed. Id. at 508. The Court highlighted that these decisions were made without any consideration of profit, and Paper Mill "does not limit its losses by closing financially unsuccessful production before their scheduled runs." Ibid. Paper Mill's "policy" sought to set its ticket prices "as near cost as possible." Id. at 508. In addition to its theatrical performances, Paper Mill produced programs that introduced children to the theatre and the dramatic arts. Id. at 520. Paper Mill also developed relationships with other tax-exempt organizations, promoting ballet and choir in New Jersey, and presenting a number of performances with these organizations. Id. at 510.

Approximately ninety-four percent of Paper Mill's gross income was derived from ticket sales. Ibid. However, Paper Mill also generated revenue from its operation of a parking lot, refreshment concession, publication of a theater program, and operation of a small art gallery. Ibid. Although Paper Mill's theatrical productions generally operated at a loss, the ancillary operations produced a small profit. Id. at 510-11 (chart detailing profit and loss from specific operations). Paper Mill also received contributions from individuals and corporations. Id. at 511. In spite of the loss generated from theatrical productions, Paper Mill amassed a sizeable surplus.

31

Ibid. All income and surplus was being utilized to produce theatrical productions, maintain the theater, and perform capital improvements to the theater. Ibid. However, the Court emphasized that should Paper Mill be dissolved, all assets must be distributed to similar charitable institution and "cannot inure to the benefit of any person." Ibid.

Despite the fact that Paper Mill "at times realize[d] a profit and generate[d] a surplus," the Court nonetheless concluded that it cannot be deemed a "commercial enterprise." Id. at 520-21. The Court underscored that, "profitability is not a consideration in determining which shows to produce, . . . a production is never closed . . . because it is losing money . . . [and w]hatever surplus exists is reinvested in theatrical productions, maintenance of the theater, or necessary capital improvement[.]" Id. at 521. Instead, the Court imparted that the focus should not be solely on the entity's net income rather, a court should engage in "a realistic common sense analysis of the actual operation of the taxpayer; mechanical centering on income and expense figures is to be avoided." Ibid. A "crucial factor [in the inquiry] is where the profit goes. . . . If we can trace it into someone's personal pocket . . . the [entity] is not entitled to tax exemption." Id. at 522 (internal quotation marks omitted) (quoting Trenton v. New Jersey Div. of Tax Appeals, 65 N.J. Super. 1, 12 (App. Div. 1960)). None of Paper Mill's profits nor "surplus can be traced into someone's pocket." Id. at 522. Moreover, Paper Mill did not pay dividends to anyone; paid its staff, actors, and employees reasonable salaries; and should it be dissolved, no part of its "surplus would flow into someone's pocket." Id. at 522-523. Therefore, the Court was satisfied from the evidence presented that Paper Mill was not a "commercial enterprise whose essential purpose is to make money. . ." Id. at 514-515.

Here, the record reveals that revenue generated by Railway Avenue from its Lease of the subject property to PCSST is applied as follows: first, to satisfying the outstanding debt service to

32

NJEDA; second, to payment of any reserve amounts due under the NJEDA loan; third, to Railway Avenue's operational expenses, including accounting, legal fees, improvements, maintenance, and environmental remediation costs associated with contamination at the subject property; and fourth, the balance, if any, is distributed by Railway Avenue to Apple, its nonprofit parent corporation.

Notably, Railway Avenue's Certificate of Formation expressly prohibits any revenue from inuring to any individual's benefit, specifically stating:

> No part of the net earnings of [Railway Avenue] shall inure to the benefit of, or be distributable to its members, trustees, officers, or other private persons, except that [Railway Avenue] shall be authorized to pay reasonable compensation for services rendered and to make payments and distributions in furtherance of the exempt purposes set forth in this Certificate of Formation . . .

Thus, engaging in a "common sense analysis" of the intended purpose of formation, organization, and operation of Railway Avenue, the court finds that it was created as a single-purpose entity, to acquire and hold title to the subject property. Paper Mill Playhouse, 95 N.J. at 521. In turn, the subject property would be leased to PCSST for its exclusive use as a public charter high school. However, in order to finance acquisition of the subject property and the renovations necessary for PCSST's actual use, Apple, through its single-purpose, wholly owned subsidiary, Railway Avenue, obtained NJEDA bond financing. The revenue stream generated from the Lease of the subject property to PCSST was designed, in part, to satisfy the financing obligations to the NJEDA and the operational obligations of the subject property. Significantly, if Railway Avenue derives any net revenue from the Lease, such revenue must be distributed to Apple, a nonprofit corporation, to further its purpose of "improv[ing] the quality of educational institutions by providing access to educational services, products, and facilities that enable these institutions to offer their students the best quality education possible. . . ." In sum, none of Railway Avenue's profits or surplus can be traced into anyone's pocket. Moreover, no allegation has been

33

raised that Railway Avenue paid any employee, consultant, or agent a salary or compensation that is excessive or unreasonable.

Apple, a nonprofit corporation, is similarly prohibited from making distributions that will insure to the benefit of an individual, stating:

> Upon the dissolution of the corporation assets shall be distributed for one or more exempt purposes within the meaning of Section 501(c)(3) of Internal Revenue Code, or corresponding section of future Federal Tax Code, or shall be distributed to a State or local government, for public purpose.
>
> No part of the net earnings of [Apple] shall inure to the benefit of, or be distributable to its members, trustees, officers, or other private persons, except that compensation for services rendered and to make payment and distributions in furtherance of the exempt purposes set forth in this certificate of incorporation.

Thus, in the event of dissolution, the assets of Apple shall be distributed to one or more tax-exempt entities. Additionally, no monies may be diverted or distributed by Apple to any individual in excess of just compensation.

Consequently, the court is satisfied from the evidence presented that Railway Avenue is not a "commercial enterprise," and satisfies the not-for-profit criteria under Paper Mill Playhouse, 95 N.J. at 514-515. See also Hunterdon Medical Center, 195 N.J. at 561.

Therefore, for the above stated reasons, the court concludes that Railway Avenue satisfies the statutory criteria for exemption as a holding company under N.J.S.A. 54:4-3.6.[20]

---

[20] As a result of the court's finding that Railway Avenue is entitled to exemption as a holding company under N.J.S.A. 54:4-3.6, the court need not address the merits of PCSST's public policy arguments.

### III. <u>Conclusion</u>

In conclusion, the court finds that during the tax years at issue, Railway Avenue was organized and operated as a holding company and satisfies all requirements for exemption as contemplated under N.J.S.A. 54:4-3.6.

Very truly yours,

Hon. Joshua D. Novin, J.T.C.